UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Jennifer Fisher

v. Civil No. 23-cv-470-SE
Opinion No. 2025 DNH 142

Southern New Hampshire Medical Center

ORDER

Jennifer Fisher brought a series of disability claims under the Americans with Disabilities Act, 42 U.S.C § 12101, *et seq*., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, against her former employer, Southern New Hampshire Medical Center (Southern). Fisher's claims arise out of Southern's responses to her requests for accommodations because of her sensitivity to noises and certain sounds, as well as Southern's employees' conduct both before and after they learned of her complaints about their behavior and her requests. Southern moves for summary judgment on all of Fisher's claims in her amended complaint. Doc. no. 30. Fisher objects. Doc. no. 34.

Southern's motion largely focuses on its repeated efforts to investigate and respond to Fisher's claims of harassment, as well as the implausibility of Fisher's complaints that her co-workers and supervisors engaged in a lengthy campaign to target her with intentional coughing and throat-clearing. Southern also argues that it offered Fisher accommodations and that, to the extent that it did not, evidence in the record shows that Fisher would not have been able to perform the essential functions of her job regardless of an accommodation.

As discussed fully herein, many of Southern's arguments have appeal and may carry the day when considered by a factfinder not bound to view the evidence in the light most favorable

to Fisher, as the court is here. But at this stage of the litigation, those arguments are, with limited exception as discussed herein, insufficient for the court to grant Southern's motion.

## Standard of Review

Granting summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "carries with it the potential to affect the outcome of the suit." French v. Merrill, 15 F.4th 116, 123 (1st Cir. 2021). A material fact is in genuine dispute if "a reasonable jury could resolve the point in the favor of the non-moving party." Id. In considering the evidence, the court must draw all reasonable inferences in the nonmoving party's favor. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018). The court may consider materials cited in the motion and other materials in the record. Fed. R. Civ. P. 56(c)(1)(3).

## Background

### I. Employment With Southern

Fisher began working for Southern in 2000 as an Administrative Secretary in the Patient and Family Services (PFS) department. Throughout Fisher's lengthy tenure with Southern, she received consistently good performance reviews.

In early 2018, Fisher complained to her then-supervisor, Patricia Greene, about the volume of her co-workers' voices. Greene suggested that Fisher post a "Quiet Please" sign at the Interpreter Services' workstation, which was next to Fisher's, and stated that she would speak with Fisher's co-workers. Although an interpreter removed the sign, Fisher posted two more

signs at the Interpreter Services' workstation at Greene's urging. Fisher noticed that the noise level decreased in the following months, though it eventually got worse. In June 2018, Fisher also complained to Employee Health Services about her co-workers' behavior.

In October 2018, the PFS department began discussing modifying the layout of the office workstations for Fisher's benefit. The department considered installing a divider wall between Fisher's and the Interpreter Services' workstations and adding a white noise device. Fisher declined a white a noise device because she was concerned it would only exacerbate her issues. Ultimately, after discussing specifics with Fisher, the PFS department decided in April 2019 that it would install the divider wall. However, as discussed further below, Fisher had transferred to another department by the time the divider was installed.

In December 2018, Fisher noticed that certain of her co-workers began repeatedly clearing their throats and coughing. These co-workers included Ingrid Cruz, an interpreter who sat nearby. Eventually, Fisher had a meeting with Cruz and Greene to discuss Fisher's feelings that Cruz was harassing her by making unnecessary noises and Cruz's complaints that she felt uncomfortable around Fisher. Throughout 2018, the noises that Fisher's co-workers made caused her migraines, and made it difficult for her to focus on her work.

In January 2019, Fisher reported her co-workers' behavior to Pamela Fallon, a nurse with Employee Health Services. Fisher complained that the noises that her co-workers made caused her pain and headaches.

In March 2019, Fisher met with Joan Basta, Southern's Director of Employee Health Services. Fisher requested guidance on how to handle what she perceived as ongoing harassment issues by her co-workers and Greene's failure to address the situation. Basta subsequently sent Fisher an ADA Certification Form and informed Fisher that her physician should complete it.

In May 2019, Greene approached Fisher and asked her what was bothering her. Fisher told Greene "that the office environment is completely toxic, her staff are incredibly unprofessional, that she didn't control the situation with her staff, and she did not address the harassing behavior being made by her staff." Doc. no. 30-3 at 4-5. A week later, Fisher sent Greene her letter of resignation, effective June 1, 2019.

On June 2, 2019, Fisher began her position as an Administrative Assistant in Southern's Food and Environmental Services (EVS) department. Among other things, the job required Fisher to perform her duties "on site." Doc. no. 30-9 at 3.

The EVS department was located three doors down from the PFS department. Fisher sat at a desk outside Director Jason Carter's and EVS Manager Miguel Gonzalez's offices.[1] At the beginning of her tenure with the EVS department, another EVS Manager, Bryan Malette, briefly occupied Gonzalez's office.

For the first six months that Fisher was employed in the EVS department, her managers did not engage in any coughing or throat-clearing. In December 2019, Fisher told Malette about her former co-workers' behavior and that it was the reason she transferred departments. Shortly thereafter, Fisher's new managers began "repeatedly, loudly, and intentionally coughing and clearing their throat as well." Doc. no. 30-4 at 3.

Fisher was diagnosed with hyperacusis and misophonia in January 2020. Hyperacusis is an increased sensitivity to noise. Misophonia is a condition causing a decreased tolerance for certain specific sounds, called triggers, which in Fisher's case included repeated throat-clearing and coughing. Her conditions caused her to experience pain, stress, headaches, and anxiety when

---

[1] For ease of reference, the court refers to Carter and Gonzalez together as Fisher's "managers" or "supervisors."

she was in an environment with consistently loud noises, particularly those that constituted triggers.

Fisher's symptoms got worse while she worked in the EVS department. Although she experienced headaches and migraines while working in the PFS department, she did not have acute trigger responses like she developed while she worked in the EVS department.

After transferring to the EVS department, Fisher's former PFS co-workers, including Cruz and Darlene Sullivan, would clear their throats when passing Fisher's office. Fisher reported Cruz's and Sullivan's behavior to Sarah McGhee in Human Resources in January 2020. McGhee told Fisher that she would address the issue. McGhee spoke to Cruz and Sullivan's manager, and the manager asked Cruz and Sullivan to stay away from Fisher.

In August 2020, Fisher requested another meeting with Basta to ask for guidance in how to handle what she perceived as harassment by her former co-workers and her current managers. She asked Basta to confirm that anything said in the meeting would remain confidential, and Basta agreed. At the meeting, Basta gave Fisher another ADA Certification Form.

On February 17, 2021, Fisher met with Valerie Fryatt, Corporate Compliance Officer, to complain about her former co-workers' and current managers' behavior. In addition to coughing and throat-clearing, Fisher complained about Gonzalez "flicking the door handle," as well as employees opening and slamming doors loudly. Doc. no. 30-13 at 3; see also doc. no. 30-5 at 49. Fisher requested "an accommodation to have a quiet workspace." Doc. no. 30-13 at 4. Fryatt testified that Fisher "couldn't take it anymore" and acknowledged that there was a "very busy lab" with "lab techs going in and out all day" right outside Fisher's office. Doc. no. 34-5 at 14-15. Fryatt told Fisher that she would bring her concerns to Human Resources and work with that department on the next steps. Fisher agreed but asked that no one share her concerns with anyone

in her current department. Fisher also stated in a follow-up email that she would get in touch with her primary care physician to have him complete a Workplace Accommodation form. Although Fryatt did not inform Fisher's managers about the complaints, Fisher believed that someone told Carter about them because Fisher's managers began making loud noises in the weeks following her meeting with Fryatt, including holding conference calls on speakerphone on the loudest possible volume setting.

Fryatt spoke with Amy Dubois in Human Resources regarding the meeting, and the two agreed that Dubois's department should investigate Fisher's complaints. Dubois told Fryatt that she would keep Fryatt informed on the status of the investigation.

On February 22, 2021, Fisher's provider, Dr. Douglas Phelan, completed an ADA Certification Form. Doc. no. 30-15. Dr. Phelan indicated that Fisher had a physical or mental impairment that affected Fisher's "ability to carry out all daily functions if exposed to loud noise." Id. at 1. He indicated that Fisher could do the essential functions of her job if she were granted an "[a]ccommodation for quiet workspace." Id. at 1-2. That same day, Dr. Phelan completed a second ADA Certification Form. It included identical information, except that it added an accommodation of "Earbuds may be required at times for treatment plan." Id. at 3-4. Dr. Phelan faxed the forms to Southern's Employee Health Services that same day.

After receiving the ADA Certification Forms, Basta spoke with Fisher regarding her requests for accommodation. Basta understood that Fisher's request for a quiet workspace was a "request[ for] an office away from the area that she was currently working." Doc. no. 30-7 at 4. Basta testified that she must involve an employee's managers in discussions regarding accommodations, but that she does not disclose an employee's diagnosis or specific medical

issues. Rather, the managers' involvement is limited to discussions of whether they can implement a proposed accommodation.

Basta inquired whether there was any extra office space within the EVS department where Fisher could work that would be quieter, though she could not recall with whom she spoke. She was told that there was no additional office space available within the department. Basta spoke with one of Fisher's supervisors, Carter, regarding whether Fisher could use noise-canceling headphones and discussed "asking those in [Fisher's] immediate area to be mindful of their noise level by closing their office doors during meetings." Doc. no. 30-7 at 10.

On March 3, 2021, Basta called Fisher and told her that there was no additional office space available but that her request to use earbuds was approved and "managers will be mindful of closing their office door if they feel their noise and conversations will impact [Fisher's] environment." Doc. no. 30-3 at 5. Basta noted that Fisher "did not seem satisfied with those accommodations mentioned." Doc. no. 30-16 at 1. Basta asked what Fisher's expectation was for a "quiet workspace" but Fisher did not respond because her managers were in the office and she did not want to discuss in their presence her medical issues or how their actions were affecting her. Basta offered to discuss with Fisher any "additional recommendations or requests for accommodation that would meet her needs." Id. Fisher did not reach out to Basta again and ultimately did not use the earbuds because she felt she could not use them as "long as [she] stayed in the harmful environment." Doc. no. 30-5 at 40.

That same day, Alton Jones, Human Resources Business Partner, met with Fisher as part of an investigation initiated by Fryatt's discussion with Dubois. Fisher relayed her complaints about her managers' and co-workers' behavior during her time in both the PFS and EVS departments. Fisher told Jones that she did not want to address the issue with Carter or Gonzalez

because she felt that her situation while she was employed in the PFS department eventually got worse after she informed McGhee about her complaints. Jones told Fisher that he would continue to investigate her claims. Fisher also asked Jones to help her transfer to another department.

On March 10, 2021, Fisher emailed Fryatt and told her that Carter "has been closing his door more often when he's on the phone, which certainly is a good thing for me, although he still clears his throat, but now he does it quieter than before." Doc. no. 30-21 at 1. However, Fisher also noticed that a part of a door handle in the EVS department was loose and made a "dinging/ringing" sound even when the door was closed. Id. Fisher informed Fryatt that she believed that the handle being loose was not "a coincidence." Id.

On March 26, 2021, Fisher again emailed Fryatt, explaining that Cruz had just walked by her and "cleared her throat firmly." Doc. no. 30-23 at 1. She explained that another EVS employee, Maria Caron, witnessed Cruz's action. Id. at 1. However, both Jones and Gonzalez separately spoke to Caron about the incident and reported that Caron did not corroborate Fisher's version of events. Doc. no. 30-22 at 1; doc. no. 30-24 at 1-2. Around this time, Fisher applied to other positions within Southern, including a position as a "Dispatcher." Fisher stated in her email to Fryatt: "I sent an email to Al Jones a few weeks ago, asking for his help to reassign me to another position, as I no longer want to work for my current supervisors in the Food/EVS department due to their continued behavior. I have 3 applications that I submitted on Tuesday, March 23rd. Hopefully something will come out of one of them." Doc. no. 30-23 at 1.

On March 31, 2021, Fisher spoke to Jones and reiterated her request to transfer to a different department. Fisher complained that other noises in her department were beginning to trigger her disabilities. Those new sounds included doors near her work area constantly

slamming and people using the badge scanner. Jones told Fisher that her "noise sensitivity would be an issue no matter which department [she] was in." Doc. no. 34-2, ¶ 40.

On April 26, 2021, Fisher emailed Jones to complain that Cruz had cleared her throat when she passed by her that morning. Doc. no. 30-25 at 6-8. On April 29, 2021, Fisher again emailed Jones to complain about throat-clearing incidents on each of the last two days, involving Cruz, Caron, and an unknown person. Id. at 5-6. She also stated that "Jason Carter and Miguel Gonzalez continue with their throat-clearing, coughing, and sneezing noises as well, although their noise activities certainly are not as bad as it was before I met with Compliance. I asked that this not be brought to their attention because I do NOT want the situation to worsen — history has shown that that's what will happen." Id. at 5. Jones responded to both emails stating that he would investigate the incidents.

On May 3, 2021, Fisher emailed Jones to ask about her request to move to a quiet workspace and to complain that Carter was not keeping his door closed. Jones discussed Fisher's email with Kelly Gilbert, Benefits Specialist, and they agreed that Jones would speak with Carter to remind him that he needs to be more mindful of the situation and close his door more often. Doc. no. 30-26 at 1-2. Jones discussed the matter with Carter, who stated that he and Gonzalez would keep their doors closed going forward. Id.

On May 10, 2021, Fisher again emailed Jones to complain about noises in the office. Specifically, Fisher was concerned that Carter and Gonzalez had their volume on their speakers too loud when they had phone calls or Zoom meetings, and it still bothered her even with their doors closed. Doc. no. 30-25 at 2-3. She also complained about both managers' "ongoing (fake) throat-clearing, (fake) sneezes, etc.," as well as door-slamming. Id. at 3.

Jones forwarded Fisher's email to Gilbert and other Human Resources employees shortly thereafter. He stated that "[a]ll claims made by Jennifer have been investigated and nothing can be substantiated on her claims of harassment" and that he believed that her issues needed "to be addressed from a[n] ADA/Employee Health standpoint." Id. at 1-2. Gilbert responded that the requested accommodation was that Fisher "needs to work in a quiet work space indefinitely." Id. at 1. She further responded:

> I think this issue is more to do with her issues with her co-workers than anything else. We have the documentation and the department is accommodating her documented restrictions, if this is not up to her standards maybe she needs to find another position, however there is nothing more we can do under ADA. The department is not saying they cannot accommodate, the employee is complaining.

Id.

On May 25, 2021, Fisher took a leave of absence under the Family and Medical Leave Act. That same day, Fisher emailed Jones, who was on extended leave, and Jennifer Steele, a Human Resources Business Partner. Doc. no. 30-28 at 1-2. Fisher complained that the day prior, Gonzalez had "coughed loudly five times consecutively, and again one more time minutes later." Id. at 1. She also complained that Sullivan had cleared her throat while walking by Fisher that same day.

While Fisher was on leave, a Southern employee, John Malone, made jokes at her expense to Carter over email.[2] When discussing an employee who would be covering for Fisher at her desk while Fisher was on FMLA leave, Malone wrote to Carter and Caitlin Masson, a Clinical Nutrition Manager, "Is Sonya prepared for the annoying level of throat clearing that goes on in the inner sanctum, obviously it'll drive a person to the nut farm." Doc. no. 34-19 at 1.

[2] Malone's position at Southern is unclear but he appears to have been an employee in the EVS department.

He also included a cartoon picture of a woman pulling at her own hair. Id. And on June 14, 2021, after Carter informed Malone that Fisher would not be able to return from leave that day because she did not have the appropriate paperwork but would try again tomorrow, Malone replied, "You know that'll be yet another slight against her that she'll add to her file" with the picture of a child crying. Doc. no. 34-18 at 1.

Fisher remained on FMLA leave until June 15, 2021. She met with Nurse Fallon that same day for a return-to-work meeting. Fisher was upset but did not explain what was bothering her because she had "trust issues" and did not feel comfortable. Doc. no. 34-17 at 1. Fisher confirmed that she was ready to return to work, and Nurse Fallon notified Fisher's manager and Human Resources that Fisher was cleared to return.

The following day, Carter emailed Jones the following:

> Jen returned yesterday and I am told she wasted no time sharing her grievances with staff (both inter and intra departmental). She went so far as to share the notes/timeline she is working on regarding noises I am making in the office (among other things). I will shut my door if I am on a call, webinar, etc. . ., otherwise, I am not shutting myself in my office like I did before she went out, I do not feel like that is reasonable (and it doesn't appear to make a difference in her feeling towards me anyway).

Doc. no. 34-20 at 1.

Fisher submitted her resignation letter on June 25, 2021, with her resignation effective as of July 9, 2021. Doc. no. 30-29 at 1. Fisher's symptoms had been steadily worsening during her tenure in the EVS department, and were causing her significant pain, stress, and anxiety. She ultimately felt that she "had no other choice" but to leave. Doc. no. 34-2, ¶ 54. She stated in her letter that she was resigning "due to the ongoing harassment activities that have been reported on multiple occasions, to multiple leaders, and it [*sic*] not resolving, and has only worsened every time I sought help." Doc. no. 30-29 at 1.

II. Dispatcher Position

Before Fisher resigned, she had two interviews for the Dispatcher position, for which she had applied on March 25, 2021. The first took place on April 26, 2021, and the second on May 17, 2021.

During the latter interview, the hiring manager stated, "[c]learly you are qualified for the position." Doc. no. 30-32 at 3. The hiring manager also asked Fisher if there would be any "rub" when having to work with her then-current supervisors. Id.

On July 20, 2021, Carter and Malette, who was now with a different employer, emailed regarding a Southern employee's retirement. In that email chain, Carter told Malette that "Jennifer finally quit" and that "it has been quiet in the office" with a smiley face. Doc. no. 34-22 at 2. In a subsequent email in the chain, Carter wrote, "Yes, Jen went crazy, although no official diagnosis, she definitely lost it. We were not speaking at all the last 2 weeks she was here." Id. at 1. Malette responded about Fisher, "She really lost her mind. Imagine going through life thinking everyone was out to get you! STOP CLEARING YOUR THROAT!!!!!" Id.

Fisher received an email on August 3, 2021, stating that Southern had "made the decision to pursue other applicants whose background and skills more closely match [its] needs for this opening at this time." Doc. no. 34-24 at 1. Fisher described it as a "standard" email that Southern sends out when it does not hire an applicant for a position. Doc. no. 30-5 at 57.

On September 15, 2021, Fisher saw that Southern had published an open position on its website for a "Facilities Coordinator." Fisher claims that the September 15 version of the posting was substantially identical to the posting for the Dispatcher position. Southern disagrees and submits a copy of the job posting with its motion. Doc. no. 30-34 at 1. That posting was created

on July 4, 2021, and contains certain overlapping, but not identical, requirements with the Dispatcher position. Id. Fisher states that the posting she saw on September 15, 2021, is different than the posting Southern submitted with its motion.

## Discussion

Fisher asserted four claims in her amended complaint, each under both the ADA and the Rehabilitation Act: 1) failure to accommodate (Count I); 2) hostile work environment (Count II); 3) retaliation — failure to hire (Count III); and 4) wrongful termination — constructive discharge (Count IV). Southern moves for summary judgment on each remaining claim.[3]

### I. Failure to Accommodate (Count I)

"[F]ederal statutes barring discrimination based on disability do more than merely prohibit disparate treatment; they also impose an affirmative duty on employers to offer a 'reasonable accommodation' to a disabled employee." Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 19–20 (1st Cir. 2004) (quoting 42 U.S.C. § 12112(b)(5)(A)).

> In order to survive a motion for summary judgment on a reasonable accommodation claim, the plaintiff must "produce enough evidence for a reasonable jury to find that (1) [s]he is disabled within the meaning of the ADA, (2) [s]he was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [the defendant], despite knowing of [the plaintiff]'s disability, did not reasonably accommodate it."

Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007) (quoting Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir. 2003)); Sutherland v. Peterson's Oil Serv., Inc., 126 F.4th

[3] The court previously dismissed Fisher's retaliation claim under the ADA. Her retaliation claim under the Rehabilitation Act remains in Count III. Other than that count, the parties did not distinguish between the ADA and Rehabilitation Act claims, and the analysis for both claims is the same. Rivera-Velazquez v. Regan, 102 F.4th 1, 9 n.4 (1st Cir. 2024).

728, 742 (1st Cir. 2025). The parties' dispute regarding this claim centers on the third element, whether Southern reasonably accommodated Fisher's disability, though Southern also argues as a backstop that Fisher was unable to perform the essential functions of her job even with a reasonable accommodation.

Initially, Southern argues that any duty to provide Fisher with a reasonable accommodation did not arise until February 17, 2021, when Fisher requested a quiet workspace during her meeting with Fryatt. Five days later, Fisher's provider completed ADA Certification Forms, in which Fisher requested a quiet workspace and permission to use earbuds. Thus, Southern contends that Fisher's failure-to-accommodate claim cannot be based on any conduct prior to February 17, 2021. Southern also argues that the undisputed record evidence shows that it offered Fisher reasonable accommodations and that Fisher failed to engage in the interactive process in good faith.

### A. Duty to Accommodate

"Because an employee's disability and concomitant need for accommodation are often not known to the employer until the employee requests an accommodation, the ADA's reasonable accommodation requirement usually does not apply unless 'triggered by a request' from the employee." Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001) (quoting Henry Perrett, Jr., 1 Americans With Disabilities Act Handbook, § 4.17, at 121 (3d ed. 1997)). In other words, a "plaintiff must explicitly request an accommodation, unless the employer otherwise knew one was needed." Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89 (1st Cir. 2012) ("The obligation is on the employee to provide sufficient information to put the employer on notice of the need for accommodation."). "An accommodation request must be sufficiently direct and

specific, and it must explain how the accommodation is linked to plaintiff's disability." Id. "This means not only notice of a condition, but of a 'causal connection between the major life activity that is limited and the accommodation sought.'" Id. (quoting B. Lindemann & P. Grossman, Employment Discrimination Law, ch. 13.VI.D.1, at 880 (4th ed. 2007)).

Fisher does not dispute that she first requested an accommodation, a quiet workspace, on February 17, 2021. Nevertheless, she contends that there is a genuine dispute of material fact as to whether she "had, or was regarded as having, a disability" prior to that date. Doc. no. 34-1 at 18. She also argues that there is a genuine dispute of material fact as to whether Southern "knew or should have known about her disability based upon her descriptions of the major life activities that were being impacted by the physical symptoms caused by the noise." Id.

Fisher has failed to point to a genuine dispute of material fact as to whether Southern's duty to accommodate her disability arose before February 17, 2021. Fatal to Fisher's argument is the fact that she failed to plead a "regarded as" claim in her amended complaint. As Southern notes, Fisher's claim in Count I is based entirely on her allegations that she requested accommodations and that Southern failed to engage in the interactive process or grant her request. See doc. no. 14, ¶¶ 49-55. Although Fisher argues in her surreply that the court should interpret her complaint as including a "regarded as" claim despite her failure to allege it, that argument is unpersuasive. As the First Circuit stated when affirming a district court's order granting the defendant summary judgment on a "regarded as" claim under the ADA,

> [A]t the time [the plaintiff] filed her Complaint, regarded as disability discrimination was barely an afterthought—a throwaway line in one paragraph of a lengthy complaint. Faced with a well-reasoned and convincing motion for summary judgment on her ADA claim, however, [the plaintiff] shifted legal theories and sought to re-characterize her Complaint in a way that might parry [the defendant's] blow. It simply will not do for a plaintiff to fail to plead with adequate specificity facts to support a regarded as claim, all-the-while hoping to play that card if her initial hand is a dud. See Fleming v. Lind–Waldock & Co.,

> 922 F.2d 20, 24 (1st Cir. 1990) ("[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings.").

Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 85 (1st Cir. 2008); see also Peterson v. Wrenn, No. 14-CV-432-LM, 2017 WL 401189, at *6 (D.N.H. Jan. 30, 2017) (rejecting a "new 'regarded as' claim that appears for the first time in response to defendants' summary judgment motion"); Saxena v. Univ. of Massachusetts Med. Sch., No. CV 19-40007-TSH, 2023 WL 6390053, at *22 n.9 (D. Mass. Sept. 28, 2023) ("Plaintiff's First Amended Complaint does not plead a claim that the Medical School regarded him as disabled. In the absence of having pled such a claim, Plaintiff cannot proceed on this theory of liability against the Medical School."). Indeed, the plaintiff in the lone case on which Fisher relies in her surreply to support her argument specifically pleaded a "regarded as" claim in her complaint. See doc. no. 39 at 3 (citing Mercado v. Puerto Rico, 814 F.3d 581, 583 (1st Cir. 2016) ("Instead, the complaint alleges that the defendants discriminated against Mercado 'by reason of' the fact that she was 'regarded as' having a physical or mental impairment within the meaning of the ADA.")). Therefore, the court analyzes Fisher's failure-to-accommodate claim as of February 17, 2021, the date that Fisher first made a request for an accommodation.[4]

B. Reasonable Accommodation

Although Fisher's arguments as to the date on which her failure-to-accommodate claim arose are unpersuasive, her remaining arguments on that claim fare better. Southern argues that it

[4] The court notes for the sake of clarity that Southern took action in response to Fisher's complaints while she worked in the PFS department prior to February 2021. Greene directed Fisher to put up signs, arranged a meeting with Fisher and the alleged harassing co-worker, and installed a dividing wall between Fisher's workstation and others, though Fisher ultimately transferred departments before installation was complete.

reasonably accommodated Fisher's disability and, to the extent that it did not, it is not liable because Fisher could not perform the essential functions of her job even with an accommodation and because she caused a breakdown in the interactive process. Viewing the evidence in the light most favorable to Fisher, there is a genuine dispute of material fact as to those issues.

Fisher made two specific requests for accommodation—permission to wear earbuds and a quiet workspace. There is no dispute that Southern provided her with the former request, though Fisher declined to wear the earbuds because she felt they would exacerbate her symptoms unless she used them while in a quieter workspace. There is also no dispute that Southern requested on multiple occasions that Fisher's current and former co-workers try to minimize noise around her.

But Fisher repeatedly asked to be allowed to do her work from a different and quieter workstation. The only evidence in the record regarding Southern's efforts to accommodate that request was Basta's unproductive inquiry about whether there was any extra office space within the EVS department. However, Fisher testified that there were open offices because several employees worked remotely, as well as conference rooms in which Southern has permitted other employees to work. Doc. no. 34-3 at 36-37; doc. no. 34-2, ¶ 43. She also provided evidence that there was available space to work in Southern's library as well as a "quiet area in the Diet Office." Doc. no. 34-2, ¶ 43.

Southern counters that Fisher "offers no evidence that any such arrangement was feasible or would have resolved her concerns." Doc. no. 36 at 4. It further argues that Fisher fails to show that the other employees who were permitted to work in conference rooms "were similarly situated, had comparable job duties, or had similar sensitivity to ordinary workplace noise." Id. Further, Southern repeatedly notes that it could not have possibly provided a workspace that

eliminated "ordinary coughing and throat-clearing" given the busy environment of a hospital. Id. at 5.

Those arguments either misapprehend the burden on Fisher at this stage or misconstrue her request for accommodations. Fisher points to evidence in the record that a) she requested to be moved to a quieter workstation apart from her current office, b) such workstations existed, c) Southern allowed other employees to use those workstations in the past, and d) Southern did not provide her with such a workstation. Fisher repeatedly asserts, and points to evidence in the record to show, that she never requested a "noiseless" environment. Rather, she sought a quieter workspace which, in turn, would have also allowed her to use her noise-canceling earbuds effectively. Southern did not provide her with the requested accommodation despite allowing other employees to work in those areas in the past. Such evidence is sufficient at the summary judgment stage.

Finally, Southern argues that even if there is a dispute of fact as to whether it reasonably accommodated Fisher's disability, evidence in the record shows that Fisher would not have been able to do her job even with her requested accommodation. Southern states that "the essential functions of [Fisher's] position required that her duties be performed on site, as set forth in the job description, and required regular in-person interaction with other employees." Doc. no. 36 at 4. It adds that "[t]hose duties included cashing out cashiers, answering phone calls, participating in meetings, and communicating with internal and external clients." Id. Southern contends that Fisher does not explain how relocating her workspace would have "eliminated ordinary workplace noise in a manner consistent with those job requirements." Id.

It is true that there is evidence in the record that suggests that Fisher was sometimes bothered by even everyday sounds that may have affected her in any workstation. See, e.g., doc.

no. 34-5 at 12 (Fryatt's testimony that Fisher expressed being bothered by traffic noise during their meeting).[5] But viewing the evidence in the light most favorable to Fisher, a reasonable jury could conclude that she could have performed the essential functions of her job at a quieter workspace. Fisher's complaints about her office focused on specific actions—her co-workers' and supervisors' throat-clearing and coughing, the volume of their voices, and doors constantly opening and closing loudly. And there is evidence in the record that Fisher worked near a particularly busy area with doors opening and closing often. There is also evidence in the record that Southern believed that Fisher could perform her job duties away from her specific office, as Basta was seemingly willing to move Fisher to a quieter workstation, though she ultimately did not because she incorrectly thought none were available. It may well be that a quieter workstation would not have allowed Fisher to perform the essential functions of her job. But the court cannot reach that conclusion on this record given the summary judgment standard.[6]

C. Interactive Process

"[A]n employee's request for accommodation . . . creates 'a duty on the part of the employer to engage in an interactive process.'" E.E.O.C. v. Kohl's Dep't Stores, Inc., 774 F.3d

[5] The court notes for the sake of completeness that Fisher stated in an affidavit that she "would not have said that" outside traffic noises bothered her during the meeting with Fryatt. Doc. no. 34-2, ¶ 26.

[6] Southern tries to bolster its argument by pointing to the fact that Fisher held four positions with other companies after she resigned, and that she lodged identical complaints about being targeted by intentional coughing and throat-clearing in three of them, despite having her own office in at least one position. Doc. no. 30-1 at 17 n.10. And, Southern notes, Fisher left her fourth position because she claimed that the lighting caused her significant head and eye pain. Id. That evidence may be relevant at trial to several of Fisher's claims, but it is insufficient to establish conclusively at this stage of the litigation that Fisher would have been unable to perform the essential functions of her job in a quiet workspace.

127, 132 (1st Cir. 2014) (quoting Enica v. Principi, 544 F.3d 328, 338 (1st Cir. 2008)). "The interactive process involves an informal dialogue between the employee and the employer in which the two parties discuss the issues affecting the employee and potential reasonable accommodations that might address those issues." Id. "It requires bilateral cooperation and communication." Id.

Southern argues that it is entitled to summary judgment on Fisher's failure-to-accommodate claim because Fisher did not engage in the interactive process. It notes that Fisher refused to wear the noise-canceling earbuds that she requested and she did not continue discussions with Basta after Basta told her that there was no other office space available. Southern also points to Fisher's request that Southern not speak to her managers about her complaints as evidence of her failure to engage.

Viewing the evidence in the light most favorable to Fisher, there is a genuine dispute of material fact over whether she sufficiently engaged in the interactive process. Fisher refused to use the noise-canceling earbuds while in her office, but a rational factfinder could view her request for an accommodation as a combination of both the earbuds and a change in workstations, to be implemented together. Evidence in the record shows that Fisher made clear that she believed that she could not utilize the earbuds in her current office. And although Fisher did not re-engage with Basta after being informed that there were no available workspaces, she testified that she did so out of frustration because Basta was not sufficiently assisting her, and she subsequently sought help with accommodations from both Fryatt and Jones. Finally, Basta admitted that she did speak to Fisher's managers about lowering their noise levels, and Fisher acknowledged as such. Southern does not explain how Fisher's request that Basta not share the

details of her disability or her specific complaints with others equates to Fisher's failure to engage in the interactive process.[7]

In short, viewing the evidence in the light most favorable to Fisher, there is a dispute of fact as to whether Southern failed to reasonably accommodate Fisher's disability after she made her request for accommodations on February 17, 2021. Therefore, the court denies Southern's motion as to Count I, other than to the extent that it seeks to preclude Fisher from basing her claim on Southern's conduct prior to that date.

## II. Hostile Work Environment (Count II)

To prevail on a hostile work environment claim under the ADA and the Rehabilitation Act, a plaintiff

> must show that (1) she belonged to a protected class (in this context, that she was a qualified individual with a disability); (2) she was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment; (5) the harassment was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and [the plaintiff] in fact perceived it to be so; and (6) that some basis for employer liability has been established.

Stratton v. Bentley Univ., 113 F.4th 25, 50 (1st Cir. 2024).[8] When considering these factors, the court "must mull the totality of the circumstances, including factors such as the 'frequency of the

---

[7] Regardless, Carter's June 16, 2021 email suggests that he was aware of Fisher's specific complaints about his and others' behavior. See doc. no. 34-20 at 1.

[8] The First Circuit has not explicitly held that it is possible to bring an ADA claim for a hostile work environment. Nevertheless, "for nearly two decades, [the First Circuit has] assume[d] without deciding that a plaintiff may raise a disability discrimination claim based on a hostile work environment theory under the ADA." Stratton, 113 F.4th at 50 n.22. The court does so here, as well, particularly because Southern does not argue that such a claim is unavailable.

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance.'" Brader v. Biogen Inc., 983 F.3d 39, 59 (1st Cir. 2020) (quoting Maldonado-Catala v. Municipality of Naranjito, 876 F.3d 1, 10 (1st Cir. 2017)).

Southern concedes for the purposes of summary judgment that Fisher can establish the first and second elements of a hostile work environment claim. But it argues that Fisher cannot show that a genuine dispute of material fact exists as to the remaining factors.[9]

A. Disability-Based Harassment

Initially, Southern argues that much of the alleged harassment of which Fisher complains occurred prior to her diagnosis or the point at which she disclosed her disability. Southern contends that this pre-disability conduct undermines Fisher's claim that the alleged harassment "stem[med] from an impermissible motivation." Brader, 983 F.3d at 59. Southern further argues that regardless of the alleged pre-disability conduct, there is no evidence that any coughing, throat-clearing, or other loud noises were directed at Fisher because of her disability. Rather, there is only evidence to the contrary, as Southern's investigation into Fisher's complaints showed that none of Fisher's co-workers or her supervisors targeted her, much less did so on account of her disability.

Southern's arguments may ultimately prevail but they do not do so at the summary judgment stage. It is true, as Southern suggests, that there is a great deal of evidence to show that

[9] For the reasons discussed below, Fisher has only shown a genuine dispute of fact regarding employer liability for her hostile work environment claim to the extent that it is based on her supervisors' conduct, not her co-workers' conduct. Nevertheless, the court discusses the entirety of Fisher's hostile work environment claim for the sake of clarity and for ease of reading.

Southern's employees did not target Fisher by making loud noises. But it is equally true that the record is replete with complaints from Fisher about her co-workers and supervisors intentionally coughing, clearing their throats, and otherwise deliberately creating a noisy environment only and specifically when she was nearby. The record also contains Fisher's sworn testimony to that effect. And there is no dispute that the employees who allegedly engaged in such conduct were aware of Fisher's protected characteristic regarding sensitivity to certain sounds and loud noises during much of her employment. Thus, whether the harassment Fisher allegedly experienced was based on her disability is a classic question for the trier of fact.

Regarding Southern's employee's conduct that occurred prior to the point at which Southern knew that Fisher had a disability, such conduct would not be actionable harassment under the ADA or the Rehabilitation Act. Quiles-Quiles v. Henderson, 439 F.3d 1, 8 (1st Cir. 2006). "But, even discounting this conduct, there was ample proof that [Fisher] was harassed because of [her] disability" when viewing the evidence in the light most favorable to Fisher. Id. Thus, the mere fact that Southern's employees may also have harassed Fisher without knowing of and prior to her disability is not fatal to her hostile work environment claim. Id.

B. Sufficiently Severe or Pervasive

Southern next argues that any alleged harassment was not severe or pervasive. It contends that the evidence in the record shows only "intermittent" incidents of everyday sounds, doc. no. 30-1 at 24, and that Fisher received exemplary performance reviews throughout her tenure, which shows that the alleged harassment did not alter the conditions of her employment.

In a hostile work environment claim under the ADA, "[w]hether the harassment is sufficiently severe or pervasive is an objective analysis based on 'common sense, and an

appropriate sensitivity to social context.'" Mailhot v. FedEx Ground Package Sys., Inc., No. 02-257-JD, 2003 WL 22037314, at *4 (D.N.H. Aug. 29, 2003) (quoting Mulvihill v. Top–Flite Golf Co., 335 F.3d 15, 23 (1st Cir. 2003)). Further, "[w]hile the conduct may be both [severe and pervasive], only one of the qualities must be proved in order to prevail. The severity . . . may vary inversely with its pervasiveness." Flood v. Bank of Am. Corp., 780 F.3d 1, 11 (1st Cir. 2015). "As a general matter, these are questions best left for the jury." Mailhot, 2003 WL 22037314, at *4 (quoting Che v. Massachusetts Bay Transp. Auth., 342 F.3d 31, 40 (1st Cir. 2003)); Gorski v. New Hampshire Dep't of Corr., 290 F.3d 466, 474 (1st Cir. 2002) ("Subject to some policing at the outer bounds, that question is commonly one of degree—both as to severity and pervasiveness—to be resolved by the trier of fact on the basis of inferences drawn 'from a broad array of circumstantial and often conflicting evidence.'" (quoting Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 895 (1st Cir. 1988))).

Viewed in the light most favorable to Fisher, the evidence shows that she suffered a significant reaction to certain noises and sounds. She complained consistently and repeatedly that her co-workers and supervisors intentionally made noises despite being aware that these noises affected her, and she eventually took a leave of absence and resigned because of the environment. In short, the "record presented here does not suggest that this case varies from the norm" in which the question of whether harassment was sufficiently severe or pervasive to support a hostile work environment claim is best left to a jury. Mailhot, 2003 WL 22037314, at *4.

C. Objectively and Subjectively Offensive

Southern argues briefly that any alleged harassment was not both objectively and subjectively offensive because Fisher's "belief that ordinary coughing and throat-clearing constituted targeted harassment reflects an idiosyncratic reaction that a reasonable person would not share." Doc. no. 30-1 at 24. But at the summary judgment stage, the court cannot draw that conclusion. As another judge in this district aptly stated when denying a motion for summary judgment on Fisher's hostile work environment claim against a different employer,

> A reasonable jury could find that repetitive coughing and throat-clearing noises—activities that Fisher reported as triggering physical symptoms of her disability (the existence of which is not disputed at summary judgment)—would cause a reasonable person in Fisher's position to find the workplace hostile and abusive. A reasonable person, even one without Fisher's sensitivities, could find a work environment hostile where her supervisors repeatedly engaged in the very conduct about which she complained in the first place, and only did so after hearing her complaints.

Fisher v. Nashua Eye Associates, P.A., No. 23-cv-548-JL-TSM, dkt. no. 66 (D.N.H. 2025). The same holds true here.

D. Employer Liability

Finally, Southern argues that there is no basis for employer liability. For the purposes of a hostile work environment claim, "an employer's liability for such harassment may depend on the status of the harasser. If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a 'supervisor,' however, different rules apply." Vance v. Ball State Univ., 570 U.S. 421, 424 (2013). Here, Fisher alleges that both her co-workers and her supervisors contributed to the harassment she faced during her employment. Therefore, the court separately analyzes the sources of the alleged harassment.

1. Supervisor harassment

Fisher alleges that both Carter and Gonzalez contributed to her harassment. "The Supreme Court has articulated clear rules governing employers' liability for a supervisor's wrongdoing against an employee." Agusty-Reyes v. Dep't of Educ. of Puerto Rico, 601 F.3d 45, 53 (1st Cir. 2010). In the context of a hostile work environment claim, "[w]hen a supervisor's harassment of an employee results in a 'tangible employment action against the employee,' the employer is vicariously liable for the 'actionable hostile environment created by [the] supervisor.'" Id. (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764 (1998)). "Tangible employment actions include 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Id. (quoting Ellerth, 524 U.S. at 761).

"Employers are also vicariously liable for a supervisor's 'severe and pervasive' harassment that does *not* result in a tangible employment action; the difference is that in such instances employers may be able to invoke a two-part affirmative defense." Id. (quoting Ellerth, 524 U.S. at 765). "This affirmative defense, the Faragher–Ellerth defense, requires a defendant employer to show both (1) 'that its own actions to prevent and correct harassment were reasonable' and (2) that the employee's actions in seeking to avoid harm were not reasonable." Id. (quoting Chaloult v. Interstate Brands Corp., 540 F.3d 64, 66 (1st Cir. 2008)); see Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Ellerth, 524 U.S. at 765.

There is no evidence in the record to show, and Fisher does not argue, that Fisher's supervisors took any specific employment action against her. She does, however, allege in her complaint that she was constructively discharged in Count IV. For the reasons discussed below,

that claim survives Southern's motion for summary judgment and so the court considers it for the purposes of employer liability in Count II.

A claim for constructive discharge may, in certain circumstances, constitute a "tangible employment action" such as to preclude a defendant from invoking the Faragher–Ellerth defense. See Pennsylvania State Police v. Suders, 542 U.S. 129, 152 (2004). Nevertheless, the defense will be unavailable in those circumstances only "on rare facts," Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 32-33 (1st Cir. 2003), and only when there is the "presence . . . of an official act," Suders, 542 U.S. at 150. Here, Fisher does not argue, and the record does not support, that any of her supervisors took any "official act" such that her constructive discharge claim could constitute a tangible employment action precluding the defense. Cf. Robinson v. Sappington, 351 F.3d 317, 337 (7th Cir. 2003) (holding that constructive discharge should be considered an official act that precludes the Faragher–Ellerth defense where it resulted from a presiding judge's transfer of an employee to another judge who resisted placing her on his staff). Therefore, the court considers the Faragher–Ellerth defense.

Southern argues that it is entitled to seek refuge behind Faragher–Ellerth because it acted reasonably in responding to Fisher's complaints and Fisher acted unreasonably in refusing to wear the noise-canceling earbuds or propose a workable accommodation. An "employer must carry its burden on both prongs to succeed in maintaining the [Faragher–Ellerth] defense." Agusty-Reyes, 601 F.3d at 55. "Both prongs involve a 'judgment call as to reasonableness, which is itself a jury issue unless no reasonable jury could decide it in the plaintiff's favor.'" Id. (quoting Reed, 333 F.3d at 34).

Viewing the evidence in the light most favorable to Fisher, Southern has not carried its burden to avail itself of the Faragher–Ellerth defense on summary judgment. The evidence shows

that Fisher's supervisors continually kept the noise in her office at a level that they understood she could not tolerate. And, according to Fisher, her managers began intentionally coughing and clearing their throats shortly after she informed Malette about her co-workers' behavior. Fisher repeatedly requested to be moved to a different workspace, which she claims was available, but Southern did not relocate her. Fisher reported, sometimes on a weekly basis, her supervisors' continued disregard of her complaints. In the weeks before her resignation, Carter stated that he would be closing his door less going forward. Thus, viewing the evidence in the light most favorable to Fisher, there is at least a genuine dispute of fact as to whether both Southern's and Fisher's actions were reasonable. As such, because Southern has not carried its burden as to the Faragher-Ellerth defense at this stage, it is not entitled to summary judgment on Count II regarding Fisher's supervisors' conduct.

2. Co-worker harassment

Unlike cases in which the plaintiff's supervisor is the alleged harassing employee, employer liability for a hostile work environment claim based on the plaintiff's co-worker's harassment is not based on vicarious liability. Vance, 570 U.S. at 427-28. Rather, when the plaintiff's co-worker is the alleged harassing employee, "an employer is directly liable for an employee's unlawful harassment if the employer was negligent with respect to the offensive behavior." Id. at 427. "The negligence analysis requires the court to review the employer's actions for reasonableness, not conduct an independent review of the underlying allegations." Caruso v. Delta Air Lines, Inc., 113 F.4th 56, 70 (1st Cir. 2024). The plaintiff "must show a genuine issue of material fact both as to (1) a causal connection between [the defendant's] action and the harassment she allegedly experienced and (2) that those actions by [the defendant]

amounted to negligence." Id. at 70-71. "In other words, the plaintiff must demonstrate that the employer knew or should have known about the harassment yet failed to take prompt and appropriate remedial action." Wilson v. Moulison N. Corp., 639 F.3d 1, 7 (1st Cir. 2011).

Southern argues that its investigation into Fisher's complaints and its repeated discussions with the alleged harassing co-workers show that it was not negligent. The court agrees.

As discussed above, there are disputes of fact as to many aspects of this case when viewing the evidence in the light most favorable to Fisher. Those disputes include whether Southern failed to reasonably accommodate Fisher and whether Fisher's supervisors' conduct constituted a hostile work environment. But Fisher does not point to any evidence in the record that would allow a reasonable jury to conclude that Southern itself was negligent with regard to her co-workers' behavior.

The evidence shows that, at every turn, Southern investigated Fisher's complaints regarding her co-workers' conduct. Although Southern found that Fisher's reports that her co-workers were intentionally creating a harassing environment were unsubstantiated, it nevertheless addressed those complaints with her co-workers and repeatedly asked them to be mindful of Fisher's sensitivities to noise. Fisher does not point to any evidence to show—and indeed, does not argue—that Southern's investigation into her claims was deficient or perfunctory. In short, Fisher points to no evidence to show that Southern's actions amounted to negligence.

Fisher counters that Southern can be held liable for her co-workers' behavior because it did not terminate any of the harassing employees and did not move her to a different department or workstation as she requested. That argument fails for at least two reasons. First, again, Fisher

does not claim or point to evidence to show that Southern's investigation into her complaints was inadequate. As such, Southern cannot be held liable for failing to discipline employees whom it determined had not harassed Fisher. Forsythe v. Wayfair Inc., 27 F.4th 67, 74 (1st Cir. 2022) (affirming summary judgment on hostile work environment claim based on employer liability where "investigation into the alleged . . . harassment was [not] too deficient for [the employer] to rely on its findings"); see Rand v. Town of Exeter, 976 F. Supp. 2d 65, 73 (D.N.H. 2013) ("[W]here the proof of harassment is weak and disputed . . . the employer need not take formal disciplinary action simply to prove that it is serious about stopping . . . harassment in the workplace."). Second, although a reasonable jury could find that Southern failed to accommodate Fisher by not relocating her to a quieter workspace, that is not the relevant inquiry for the purposes of employer liability for a hostile work environment claim. Rather, Fisher must point to some evidence that there is a "causal relationship between [Southern's] investigation and the harassment." Caruso, 113 F.4th at 71. She does not even attempt to do so, nor could she based on the summary judgment record.

For these reasons, Southern is entitled to summary judgment as to Fisher's hostile work environment claim based on her co-workers' conduct, but not to the extent that the claim is based on her supervisors' conduct.

## III. Retaliation

Fisher's retaliation claim is based on Southern's decision not to hire her for the Dispatcher position. Specifically, she alleges that Southern did not hire her for the position because she complained about a hostile work environment and because she requested accommodations for her disability.

The court analyzes retaliation claims under the ADA and Rehabilitation Act using "the familiar burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801–03 (1973)." D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 41 (1st Cir. 2012). Under McDonnell Douglas, a plaintiff must make out a prima facie case of retaliation by "show[ing] that (1) he or she engaged in protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) there was a causal connection between the protected conduct and the adverse action." Id. "Once a plaintiff makes such a showing, the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for the adverse action." Id. "If the defendant does so, the burden shifts back to the plaintiff to show that the proffered legitimate explanation is pretextual, meaning that the defendant was motivated by a retaliatory animus." Id.

Southern concedes for the purposes of its motion that Fisher meets the first two prongs of her prima facie case. It argues, however, that Fisher cannot show a causal connection between her protected activity and Southern's decision not to hire her for the Dispatcher position. It further contends that it has articulated a legitimate, non-retaliatory reason for not hiring Fisher for the position and that she fails to demonstrate that the reason was pretextual.

Viewing the evidence in the light most favorable to Fisher, she has shown a causal connection between her protected conduct and Southern not hiring her for the Dispatcher position. The burden of establishing a prima facie case of retaliation is "light." DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008), as corrected (July 10, 2008). An inference of causation "may be appropriate where there is close temporal proximity between protected activity and an adverse action" when there is "evidence of a decisionmaker's knowledge of the protected conduct." Stratton, 113 F.4th at 45. Here, Fisher repeatedly raised concerns about an alleged hostile work environment while in the EVS department, lodging her last official complaint about

her managers' behavior on May 25, 2021. She also complained about her managers' behavior in June when she returned from FMLA leave, and Carter was aware of these complaints. She further discussed "ongoing harassment" in her resignation letter later that month. Doc. no. 30-29 at 1. Although Southern correctly does not dispute that the time between Fisher's final complaint and Southern's decision to reject her constitutes close temporal proximity, see, e.g., Mariani-Colon v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 224 (1st Cir. 2007), it argues that there is no evidence that the decision-makers knew of her complaints. But, viewed in the light most favorable to Fisher, a reasonable jury could interpret the hiring manager's question regarding whether there would be a "rub" working with her current supervisors as his knowledge of Fisher's complaints about her managers. Given the light burden associated with a prima facie case, that evidence is sufficient.

The burden then shifts to Southern to articulate a legitimate, non-discriminatory reason for not hiring Fisher for the position. It may do so "by identifying enough admissible evidence to 'support a [rational] finding that unlawful discrimination was not the cause of the employment action.'" Straughn v. Delta Airlines, Inc., 250 F.3d 23, 33-34 (1st Cir. 2001) (quoting Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5-6 (1st Cir. 2000)). Southern points to company records stating that it did not hire Fisher for the position because she "[d]oes not meet preferred experience." Doc. no. 34-30 at 1-2. That is sufficient to meet Southern's burden at the second step of the analysis.

The burden thus shifts back to Fisher to show that the proffered legitimate explanation is pretextual, and Southern was actually motivated by a retaliatory animus. Giving Fisher every reasonable inference, she has sufficiently identified evidence to raise a dispute of fact as to whether Southern's reason for not hiring her for the Dispatcher position was pretextual. Although

Southern's stated reason for not hiring Fisher was because she lacked experience, the hiring manager told Fisher during her second interview that "[c]learly [she is] qualified for the position." Doc. no. 30-32 at 3. Further, as mentioned, a reasonable jury could determine that the hiring manager's question regarding whether there would be a "rub" working with Fisher's then-current supervisors meant that he was aware of Fisher's complaints regarding her supervisors while in the EVS department. And, given that emails involving Fisher's supervisor after she resigned suggest possible animosity regarding Fisher's complaints, there is sufficient evidence of pretext, albeit barely.

For these reasons, Southern's motion for summary judgment on Fisher's retaliation claim is denied.

## IV. Wrongful Termination – Constructive Discharge (Count IV)

"Constructive discharge typically 'refers to harassment so severe and oppressive that staying on the job while seeking redress—the rule save in exceptional cases—is intolerable.'" Gerald v. Univ. of Puerto Rico, 707 F.3d 7, 25 (1st Cir. 2013) (quoting Lee–Crespo v. Schering–Plough Del Caribe, Inc., 354 F.3d 34, 45 (1st Cir. 2003)). "A successful constructive discharge claim requires 'working conditions so intolerable that a reasonable person would have felt compelled to resign.'" Id. (quoting Suders, 542 U.S. at 147). "A plaintiff seeking to withstand summary judgment must point to evidence in the record showing that just such conditions existed." Id. "The standard to meet is an objective one, 'it cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held.'" Id. (quoting Roman v. Potter, 604 F.3d 34, 42 (1st Cir. 2010)). However, although "constructive discharge must be gauged through the eyes of an objectively reasonable person, the Court . . . necessarily must consider the view of

a reasonable person with similar . . . limitations" to those of the plaintiff. Huard v. Kennebec Cnty., No. 1:16-CV-00473-GZS, 2019 WL 1264864, at *12 (D. Me. Mar. 19, 2019). "Constructive discharge is a heavily fact-driven determination." Willinghan v. Town of Stonington, 847 F. Supp. 2d 164, 191 (D. Me. 2012).

Viewing the evidence in the light most favorable to Fisher, there is a genuine dispute of material fact as to whether she was constructively discharged in June 2021. Fisher's disability caused her significant pain, stress, and anxiety because of her co-workers' and supervisors' behavior. Southern declined to move her to a quieter workstation even though such areas were available and she repeatedly requested to be moved. Fisher complained continually about the noise level in her office up until the point of her resignation. Given these facts and the summary judgment standard, a reasonable jury could determine that Fisher was constructively discharged.[10]

## Conclusion

For the foregoing reasons, Southern's motion for summary judgment (doc. no. 30) is granted in part as to the portions of Counts I and II identified herein and is otherwise denied.

SO ORDERED.

Samantha D. Elliott
United States District Judge

September 30, 2026
cc: Counsel of Record

[10] Southern argues that Fisher's acts of applying for other positions at Southern while remaining employed and giving two weeks' notice undermine her constructive discharge claim. Southern is free to make that argument to a jury, and a jury may be persuaded, but it has not shown that it is sufficient to warrant summary judgment.